The first case that we'll hear is United States v. Herrera. This is 19-2126, and we'll hear first from Mr. Bieler. Thank you, Your Honor, and may it please the Court. The Court should reverse Mr. Herrera's convictions for all of the grounds identified in his opening brief and reply brief. Today, I intend to focus on the first ground, which will certainly take questions the Court may have on any of the other issues. The Court has established in Herrera essentially a six-factor test, or four factors depending on how you look at it, and all of those factors dictate reversal in this case. With respect to Mr. Herrera, we're looking at two separate grounds for continuance. One is the disqualification of counsel, and the second is the late discovery of documents. Are you treating those together right now, or taking them one at a time? No, I'm treating them together. I think those are both grounds for reversal in Mr. Herrera's case that Mr. Sanchez and Mr. Baca have joined in the continuance issue on the grounds of the discovery that Mr. Herrera had the unique circumstance of lead counsel being disqualified just eight weeks before trial. Let me focus you first then on that disqualification of counsel argument. I have some concern that the District Court denied it with leave to raise it again if you were actually unable to get prepared during that remaining eight weeks, and there was never a subsequent motion to continue based on the change in counsel. So isn't that argument forfeited? No, Your Honor, and I think the reason is simply because the District Court gave leave and the focus of the subsequent motions to continue had to do with the new discovery. It was still all part of the same request for relief, and I think that there's no requirement, even if the court treated it separately, there's no requirement that Mr. Herrera re-raise it just because the District Court granted leave to do so in order to preserve it for appeal. So you're saying we're in that area of objection or lack of objection where it is very clear that the court had ruled and there was no point and you're reasserting the motion? I think yes and no. Yes, in the sense that it was very clear the issue was raised and the judge denied it. No, in the sense of how I've argued that it was really part of the same motion that Mr. Herrera's trial counsel asserted below in that in addition to being new to the case, which the court knew, it was argued ad nauseam in early December, and then in January what was argued was the substance of the discovery dump that the government had propounded upon the defense, and it was really all part of the same issue for Mr. Herrera's team in that not only do you have new counsel trying to get up to speed on the case, but you've got this new discovery they have to wrestle with, and because it was a multi-defendant case, the other defendants were assisting in helping draft motions, drafting arguments. The government mentioned how a defendant who then ultimately pled filed the motion to continue. That's just a function of the trial teams dividing the labor because so much was going on in those two months before trial, but Mr. Herrera's discovery that was dumped on them and what the focus of the arguments in January were just a compounding factor in the case. All right, go ahead. Sorry, Carolyn. I wanted to ask you about the other ground, and that is when Mr. Davis, as lead trial counsel, had to disqualify. As I understand from the briefs, Judge Browning then met in camera with lead trial counsel to see the status of his development of the case. One of the shortcomings is that nobody has provided us information in the briefing, at least, and of course presumably the government is unaware of it since it was in camera, of what Judge Browning would have known that we have no way of knowing, and that is what was the status of his preparation? Had, for example, Nisbala already prepared cross-examination outlines of these 40 witnesses or so that the government was planning to call, and how do you address sort of that elephant in the room that we really don't know what the status was before new trial counsel came on board? Well, there is some evidence in the record, your honor, of what the trial court knew apart from any potential ex parte pleadings or disqualify. Mr. Davis said, and this is in the record, that if the court disqualifies him, they're going to need a continuance. In fact, one of the grounds argued against disqualification was they won't be ready for trial because I'm lead counsel. It was also clear in the first motion to continue the division of labor between Mr. Davis and Nisbala. So, Nisbala was brought on as research and writing attorney, and Mr. Davis's job was to review the discovery, prepare for, you know, the examinations, and that sort of thing, and Ms. Bahala's job was to do the research and writing, which was extensive, so she wasn't ready for that. Well, let me just ask this follow-up question, and then I'll shut up. Nisbala, you do identify as the legal research and writing attorney, but as we know in the real world, a lot of times a research and writing attorney will also serve particularly as second chair of a trial of going through the discovery and preparing examination outlines for the person that's actually going to be doing the opening, the closing, the cross examinations, the direct examinations, and that's, I think, the big question mark. So, when Mr. Davis says new trial counsel is going to need a continuance, that's just his conclusion. You know, we have to, under Rivera, to go beyond the conclusion and get a handle on what was the status of the examination outlines, the cross examination outlines, and we don't really know, other than the characterization of Ms. Bahala as a researcher and writer, whether she was actually, or Mr. Davis had already prepared those examination outlines. And that's true, Your Honor, to an extent. I think what we do know is, and certainly Ms. Bahala was intending to be second chair and sit through trial. That was no secret or anything like that, and she certainly was going to assist Mr. Davis in any way needed, including, as the court mentioned, potentially preparing those outlines and that sort of thing. But what we know and what's on the record is that she wasn't going to be the lead counsel conducting those examinations. So, there's a different step that you take when you're the one going to do those cross examinations, studying the statements, preparing yourself for the direct testimony, so you can be ready to impeach or deciding the cross examination course. And the other thing we know is that, you know, one of the most important factors under Rivera is the harm to the defendant. And I think there was clear harm here, in the sense that, in addition to Ms. Bahala having to switch roles, switch hats, essentially in a two-month period, that the government, in what was really a design plot, provided all this new discovery. So, in addition to Ms. Bahala switching hats, as the court has identified, you know, from second chair to first chair, she now has to process all this new information, as well as what else was going on during those two months. There were because it's really unclear in the briefing, despite the length of it, what exactly was produced at the 11th hour. As I understand, I think it was all transcripts of telephone calls made by inmates. And so, the first question is, am I correct that that's what we're talking about? All of this was transcripts of telephone calls. And the second, or recordings, sorry, of telephone calls. And the second issue is, the government says that with each dump, there was a letter that had a index of what you were getting. And so, it seems to me, you would be able to pretty quickly call out those calls that were involved somebody who was going to testify, since you're cross-examination purposes. Can you respond to both of those? Sure, Your Honor. So, there were about 16,000 pages of discovery, which included reports, prior acts of some of these cooperating witnesses, things that were clearly Giglio material that the trial court had turned, had ordered to be turned over months ago, and things that the government had in its possession for months, in some case, years. So, it's not newly obtained things that the government. So, the 16, excuse me, the 16,000 pages was part of this very late dump? Correct. Okay, thank you. And then there was an additional. And that was two months, is that the one that was two months before trial? Correct. And there's an additional 6,000 pages provided during trial. Then there were, with respect to the calls, there were about 60,000 hours of calls. And those calls were of cooperating witnesses who were testifying at the trial. And so, while there was an. And when did those calls occur? I mean, if you're looking at whether the government had this information for many, many months, and maybe years, that's one thing. But if we're talking about recordings of that you're going to trial, that's a different picture. Yes, Your Honor. And that is a good point. So, it was particularly pernicious in this case, because way back in 2016, the government acknowledged having these calls, agreed to do a rolling production of the calls to the defense. And despite the defense's protestations all the way up through trial, didn't turn them over, the bulk of them were not turned over until this dump. And so, because they were audio calls and not transcripts, although you knew the name of the person making the call, you couldn't word search it like you could with a transcript. You had to actually have. So, the very recent dump that you're referring to, that is the 60,000 hours of calls, or that's just part of that? No, that's 60,000 hours of calls. There were some other calls produced earlier, a much smaller amount. And so, that's what counts. 60,000, are they all calls of witnesses who you expected to testify? That's correct. The vast majority, and many of them were used during trial that were located, and then many were identified after trial when there was more time, and that was part of the call. What do we do with the district court's finding that the government acted in good faith in production of discovery? I mean, there's an express finding of that. I think you have to find that as an abuse of discretion. There's no way to interpret it any other way. The court had ordered these calls to be produced way back in 2016, and ordered the government to review the with a defense attorney hat in mind, looking for exculpatory information. The government had agreed to do it on a rolling basis, then turned back on its agreement, and the defense repeatedly and diligently brought that to the trial court's attention, and then when it got the dump, asked for the continuance. So, I think it's an abuse of discretion, which the court needs to find to reverse on that point. Well, let me follow up. You say when you got the dump, you asked for continuance. Well, you got a dump two months before, and you didn't ask for continuance until three days before trial. I'm troubled a little bit about how long you waited to file your motion for continuance. Well, that was the renewed motion. The first motion to continue was actually filed at the same time that the dump was being received. So, at the time of Mr. Davis's disqualification, counsel moved to continue. Well, that was a disqualification motion, right? There wasn't a motion based on late discovery until three days before trial. I think the first one that was filed was actually a few weeks before trial, and then it wasn't argued at a hearing, and then there was a second sealed motion arguing for it. So, there are really two motions centering on the discovery dump, the second of which was three days before trial, the first of which was several weeks before trial. And so, I think the other thing is to understand what was going on at this time. As the record is clear, counsel were reviewing 200 jury questionnaires to try to prepare for voir dire, and Mr. Herrera's counsel was trying to, Ms. Valhalla changed her hat from research and writing to lead attorney, and Mr. Maynard, the second lawyer, brought on essentially trying to review the initial case material, which constituted approximately 40,000 pages of discovery and another 10,000 hours of recording. Judge Bacharach, could we have some additional time here? I wanted to get into the issue that we haven't addressed and only Mr. Herrera has raised. The exclusion of exculpatory statements is an issue that Mr. Herrera has by himself. Could you discuss that issue? Certainly, Your Honor. So, the government had an informant who was wearing a wire inside the prison and had conversations with Mr. Herrera after Mr. Molina's murder, about the murder, and Mr. Herrera made both inculpatory and exculpatory statements on those recordings, and the trial court permitted the government to admit the inculpatory statements. In response, Mr. Herrera's counsel wanted to impeach those statements with the exculpatory statements, which the trial court denied on the basis, essentially, that it was unconstitutional. I think as our briefing makes clear, the other circuits that have addressed this issue have not looked at it so narrowly and essentially agreed that, you know, with the committee commentary and how the 801 rule was developed, that you can impeach a party admission with the other statements made by that party. And the district court's thinking on that was, if you want to go down that road, you just need to take the stand. Is that? Certainly, yes, and force Mr. Herrera into essentially a Hobson's choice, either get this exculpatory information before the jury and testify with all that comes with, or don't testify and the jury doesn't. I think it's from the government's brief. It could be from someone else's brief, but I will say the government's brief. They cite a Seventh Circuit case, U.S. Baruchi that would support the district court's ruling. I think that's right. I think Mr. Herrera cited some other out of circuit cases that support his position on the case, but I think the court need only look to the rules of evidence and the commentary that we discuss in the briefing that, you know, it's always been the notion that one can impeach one's own hearsay statements. Well, if we look only at the rule, the plain language of the rule wouldn't allow it, right? I mean, the plain language of the rule excludes subsections A and B, which would be statements by the declarant. And so we have to go from the plain language of the rule and look at the commentary to come out the way you want us to come out on this, right? That's right. And what the commentary and the other cases discuss is that it wasn't included in those two sections, the plain language, because it was thought to already be something that was permitted. To me, it doesn't make sense. And I'll let you educate me on why the Shea rule would exist, because, for example, you just said it's always been the rule that you can impeach your own hearsay statement. 801D2A identifies an admission of a party opponent as something that is not hearsay. And so now when you get back to Judge McHugh's question, it says what a hearsay statement, which doesn't include an admission of a party opponent, or the statement described in 801D2CD or E, say an entity that would be the equivalent of an admission of a party opponent. Now your rule is triggered, but what you're relying on is commentary in this First Circuit opinion, which I think is the only circuit opinion that exists to support your argument. And it doesn't make sense because an admission of a party opponent, by definition, is not a hearsay statement. What's wrong with that? Well, I think a couple of things is, you know, the understanding from the common law, right, which is, yeah, I understand that the rule defines it out of hearsay, but it's a statement nonetheless. And the impeachment rule with respect to hearsay makes it clear that if you do offer the evidence for impeachment, it's not offered for the truth, the court can give a limiting instruction if it wants. The other problem is the constitutional issue that Mr. Herrera raised, which essentially creating this rule or reading this into the rule as the Seventh Circuit has, makes it so that a person can't present their full defense and essentially has to decide between taking the stand, which is their right, or remaining silent, which is their right versus presenting a full defense. I'm going to test that a little bit because I think the Supreme Court has been pretty clear that your right to present a complete defense doesn't mean you don't have to comply with the rules of evidence. And here we have a rule of evidence that I think on its face does not support your argument. And you're saying, well, if you enforce the rule, you've violated my constitutional rights. And I don't think it's given that it violates your constitutional rights. I mean, the evidence is excluded. It's certainly not a given. I think if you look at the particular circumstances of this case, however, where the only other evidence besides Mr. Herrera's statements or statements from cooperating witnesses who had good reasons to say what they were saying and were heavily impeached, the only direct evidence of Mr. Herrera's guilt was these statements. And so he should have been able to impeach them. And I think that's my time. I appreciate it. Judge Briscoe, do you have any more questions? No, thank you. Oh, you bet. Judge McHugh, do you? Okay. Thank you. I'm afraid you're out of time for your rebuttal. That's okay. But Mr. Williams, in fairness, I'm going to give you an extra minute. You don't have to take it, but it's yours if you want it. May it please the court. My name is Richard Williams. I'm an assistant United States attorney with the U.S. Attorney's Office for the District of New Mexico in Las Cruces. And I represent the United States in the case before the court. The court should affirm Mr. Herrera's following up on the questioning regarding the continuous. The court should find that Mr. Herrera did waive the argument relating to new counsel. In the hearing on December 7th, the district court invited Mr. Herrera to submit material ex parte, and Mr. Herrera told the district court he could do so about getting the new attorney, Mr. Maynard, up to speed. The court denied the motion without prejudice to renew, calling the new attorney, Mr. Maynard's resume impressive and expressing confidence in the work of the prior attorney, Mr. Davis. The court twice said that we will continue to monitor the situation. When the district court was praising Mr. Davis, did that occur after the in-camera discussion? I'm not aware of any in-camera discussion. What is on the record in the hearing was the invitation to submit materials ex parte to Mr. Herrera. And then in post-trial briefing, Mr. Herrera acknowledged in his motion for new trial that he did not renew his motion on this ground. And that's at volume one, page 1880. So based on that, I would submit that this court should find that that aspect of the argument is either waived or abandoned. Can I ask you, Mr. Williams, I just want to make sure that I have a handle on this factually. So as I understand it, you're saying Judge Browning said, okay, Mr. Davis, you can present to me. Nobody else will know, you know, what the status of the cross-examination outlines, et cetera, is. What have you done tangibly that can be handed off to a new lawyer so that that person doesn't need to start from zero? And you're saying that nobody ever, that Mr. Davis didn't take Judge Browning up on that opportunity. And so Judge Browning then, as I understand what you're sort of implicitly suggesting is, that he had to make a call on the continuance on whether this new lawyer needed the time. And he would have had no way of knowing, and therefore we would have no way of knowing really what the status of the examination outlines was at the time that he decided to deny a continuance. So I believe the hearing in the court invited, it would have been Ms. Bala to submit materials ex parte because Mr. Davis was the attorney who was being dismissed. And then in the motion for new trial, Mr. Herrera acknowledged that he did not renew the motion to continue on that ground. But were those, but was that information given to the court ex parte? I'm not aware of it. Okay. Let me, turning to the continuance based on late discovery, there were two motions filed. One, the court didn't deal with and instead, because another motion had been filed afterwards. On when, when was the earliest of the motions for a continuance based on late discovery filed? Four days before trial. But I thought, okay. And then there was a second motion that was three days before trial. Is that right? It was thereafter. I'm not sure if it was three days or over the weekend. Okay. The first motion was on the Thursday before the Monday trial. Okay. And then. Can you explain to me what was going on in terms of, from the government, government's perspective on why there's so much discovery being produced at the 11th hour on this trial? I mean, this is a, these are a lot of pages of documents and hours of recordings that are being delivered to the defendants very close to the start of trial. Why couldn't that have been delivered sooner? Well, some aspect of that relates to the fact that the discovery was ongoing as to both trial one and trial two. So this trial was the first case to go to trial from the severed indictment. And so this discovery was ongoing as to both of those cases and all of the remaining defendants. As to the calls in particular, as Mr. Baca notes in his reply brief, they were able to glean the caller, the date, the volume, and the number called. But what he just, what we just learned was that that 60, was it 60,000 hours of recordings, every single recording was of a person who was going to testify against the defendants at trial. So that says to me, they've got to listen to all of that. And that's not in the record, that every single person in those calls were people identified on the government's witness list. In addition, with respect to those calls, they were discussed at length at a hearing on November 8th, at which time the court learned that there were a significant volume of calls from both the New Mexico corrections and local jails. And there was discussion with the district court about when those calls were going to be disclosed. And at page 1168, the district court indicated that the government is in good shape to meet the deadline. This was well before the jinx deadline was in place and even well before the final witness list was in place. Now there had been an earlier witness list with many more people on it, but the district court had asked the government to be over-inclusive initially and then to trim it down for the witness list that was filed in mid-January. Well, the fact that the court said at one point, you're saying, I guess, November 8th, that the government was in good shape, that doesn't help us understand this late dump of both pages and telephone recordings. And as the court mentioned earlier, the discovery was accompanied with transmittal letters. And there are examples of the transmittal letters in the record and cited. And those transmittal letters reflected the items that were being disclosed and did so with some specificity so that parties could identify which items were relevant to Trial 1 and which items were relevant to Trial 2. In addition, there were many thousand pages of documents that on the log related to tool inventories that appeared to come from the business records from the prison. Such documents being the type that can be reviewed quickly and their significance understood. The logs also explained which witnesses the reports related to, for example, 302s. And that was why I would submit it was significant that when the motion to continue was filed shortly before trial, that there was nothing presented to the district court explaining the significance of any of this discovery. So evident, you know, for example, as I think you indicated, the logs would say, say the 2014 Molina murder or the 2015 murder conspiracy on the two correctional officials. But the nature, the content of the conversation wasn't disclosed in the logs. So you would have the caller, let's say it's Garcia, and you would have, say the number, and you indicated that it would be the number called. Let's say it was Duran. Well, what Mr. Herrera, Mr. Baca, and Mr. Sanchez would not have known was whether or not Garcia and Duran were talking about Herrera, you know, saying, you know, Herrera was kept out of the loop, theoretically, or Sanchez was really kept out of the loop. This was only Baca's deal, or Baca didn't actually call the hit. Nobody would really be able to know whether or not it was relevant, inculpatory, exculpatory, unless they actually listened to every one of these calls, right? That is correct. The log wouldn't have helped them at all. No, the information that they were able to glean regarding the calls was the caller, which would have identified whether it was a person relevant to trial one, the date, and the duration. For example, on the Rodriguez call with his mother, there was no way for Mr. Baca's counsel to know that that was helpful to Mr. Baca because Mr. Rodriguez indicated he didn't know anything that Baca was involved until you actually listened to the call. Nothing in the log would highlight that you're going to find that, correct? That's correct, and to be clear, that particular call was the one that was disclosed after trial. But that's just an example that you don't know whether there's something in there that's helpful to the defense of your client until you actually listen to it. That's correct, although you do know, again, who the caller is and what that person's significance to the trial would be. And if you'd given them 10 phone calls and told them who was making the call, it might have been reasonable to say you have time to get it done, but it's more difficult when there's so many calls delivered so late in the day. And I know the district court several times in the opinion says, well, they weren't going to use this in their case in chief, and so it was only relevant for impeachment purposes, but the entire defense was based on impeachment. So I didn't find a lot of that they weren't going to be called in the case in chief. That the particular witnesses were not going to be called? That the calls were not going to be used during the government's case in chief. I mean, of course the government's not going to use that Rodriguez call in its case in chief. And I think what the court was identifying is that the calls that were going to be admitted as exhibits were being separately identified. And these calls, which again were disclosed well before the jinx deadline and in accordance with the hearing in November, would be available to be mined for impeachment purposes. And I believe that's what the district court was focusing on when he said that. I would also note that after the motion was filed the week before trial, there was an all day hearing on that Friday at which at the beginning of the hearing, it was brought up that the motion had been filed and had not been sealed. It was at that point that counsel for Mr. Sanchez acknowledged that he had filed it, but that it actually had been drafted by someone else and hadn't been reviewed carefully. And then nevertheless, no one brought up the motion to be argued at any point during the hearing on that day. I don't know. You said it in your brief, and I really I'm struggling to figure out the point. You know, when, as a practice, I made a motion and the judge said, you know, okay, Bobby didn't remind me about it. Well, you know, you're not supposed to have to remind the judge of I mean, he presented the argument. I mean, so what if he didn't remind the judge that he wanted to orally argue it? It was it was a bidding motion. Well, I would suggest it indicates that the defendants were not pressing the motion to the district court. They all knew that the 1500 jury questionnaires had been sent out and that the 200 jurors were on their way on Monday and that this was the last court day before that. And as the court indicated in its in its order, it had questions about whether the defendants wanted the motion to continue to be granted based on all the work that had been done. Well, they didn't they didn't withdraw the motion. I mean, it was a pending motion. That's correct. And it then was eventually argued. I mean, it was only a couple of days or a day later, a couple of days later, it was argued, right? Well, it was it was ruled on on the Monday next the start of jury selection. Right. Regarding the other Rivera factors, I would suggest that the Mr. Herrera can't show in pursuing it. As noted, the calls were known about in November. There were numerous hearings in November through January, and it was not ever raised at that point. I would also suggest that Herrera cannot show the likelihood that the continuance would have accomplished its purpose, that they did not identify how long of a continuance they were asking for, how much of the discovery was relevant to trial one. And I see my amount of time. Judge Briscoe, do you have any additional questions? Just one question. This this late discovery dump was that for both trial one and trial two? It included materials relevant to both trial one and trial two. Okay. Thank you. Judge McHugh, do you? No. Okay. Thank you. This matter will be submitted.